23 F.3d 409
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Michael Lynn PARKER (92-6599); William Perry (92-6600);
Terry Warren (92-6601); Tyrus Blalock (92-6602); Vernon
Armstrong (92-6603); Darren Armstrong (92-6604); Keith
Murphy (92-6677), Defendants-Appellants.
 Nos. 92-6599, 92-6600 thru 92-6604, and 92-6677.
 United States Court of Appeals, Sixth Circuit.
 May 10, 1994.
As Amended on Petition for Rehearing and Rehearing
En Banc June 3, 1994.
 
 Before: GUY and RYAN, Circuit Judges; and WELLFORD, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Seven defendants appeal from their convictions and sentences in this cocaine conspiracy case. Each defendant raises numerous issues, ranging from the sufficiency of the evidence to technical sentencing matters. After considering each of the defendants' arguments, we affirm all the convictions in this case, but vacate certain of the sentences imposed, and those sentences vacated are remanded for resentencing.
 
 I.
 
 2
 The investigation in this case began in August 1989, when Eric Patton, a special agent with the Tennessee Bureau of Investigation, began working undercover in Dyersburg, Tennessee, in an area commonly known as "crack alley." Crack alley is an area in which people openly deal narcotics on the street. A practice of "rushing," when dealers attempt to sell drugs to occupants of cars as the cars stop in the area, can be routinely observed. The testimony of Agent Patton and several other witnesses portrayed a conspiracy in which defendant Darren Armstrong directed the supply and distribution of crack cocaine. The operation utilized juveniles as young as 11 years of age to distribute cocaine.
 
 
 3
 All of the defendants argue that the evidence was insufficient to convict them of the charge in Count 1 of the indictment--conspiracy to distribute cocaine. The standard of review used in determining sufficiency of the evidence supporting a verdict of guilty is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). In performing this review, we must heed the rule that "[w]itness credibility is solely within the province of the jury." United States v. Schultz, 855 F.2d 1217, 1221 (6th Cir.1988). With these principles in mind, we recount the story told by the numerous witnesses in the light most favorable to the prosecution.
 
 
 4
 One of the witnesses testified that Darren Armstrong made his money from the sale of drugs and that he had several people working for him. Defendants Keith Murphy, Tyrus Blalock, and William Perry worked for Darren. In turn, defendant Terry Warren worked for Murphy. Nathaniel (Sandy) Taylor, who was addicted to crack cocaine during the relevant time, testified that he made various buying trips to Memphis. He stated that "if Mr. Murphy and Parker wanted something they would give the money to Darren Armstrong and he would give it to me." (App. 612.) On one trip, Terry Warren accompanied Taylor. Taylor also stated that Rodney Turner accompanied him on several of these trips. On each trip, Taylor would take between $500 and $1,000. Rental cars were used for at least some of these trips.
 
 
 5
 Ivory Brown testified that while spending time in the county jail he had helped Darren Armstrong, who also was in jail. For 17 days, Brown was on a work-release program. During those 17 days, Brown acted as an intermediary between Darren and his brother, Vernon Armstrong, relaying messages about what was happening to the money that Darren was making in the drug trade.
 
 
 6
 There also was testimony about several different sales of crack cocaine to both Agent Patton and confidential informants, and about incidents in which crack cocaine was found in the possession of defendants. In addition to being evidence of the ongoing conspiracy, this testimony bottomed several of the substantive counts in the indictment.
 
 Specific Sales or Possessions:
 
 7
 1. On June 8, 9, and 11, 1989, two confidential informants made controlled buys of cocaine from defendant Terry Warren. (Counts 2, 3, and 4, charging only Warren.)
 
 
 8
 2. On August 7, 1989, Agent Patton located Darren Armstrong and attempted to get his attention in order to purchase some crack cocaine from him. At this point, Darren Armstrong told defendant Tyrus Blalock to give Agent Patton his beeper number and to tell Patton to beep him in about 20 minutes. Patton attempted to beep Darren Armstrong, but Armstrong did not return the call. Patton then saw defendant Michael Parker and asked him where Darren was. Parker insisted that Patton tell him why he wanted to speak with Darren. When Patton told Parker he was looking for Darren because Darren and Blalock had agreed to sell him some cocaine, Parker said he would find Darren and bring the cocaine to Patton. Ten minutes later, Parker returned to Patton's car and handed him an "eight ball" of cocaine, an eighth of an ounce or just a little over three grams, for which Agent Patton paid $140. Patton testified that three grams for $140 was the quantity and price that he had negotiated with Blalock and Darren Armstrong. (Count 5, charging only Parker.)
 
 
 9
 3. On August 17, Patton again sought to purchase cocaine from defendants. Patton approached Vernon Armstrong, Darren's brother, and inquired about purchasing drugs. Vernon directed Patton to defendant William Perry, with whom Patton then negotiated a price and quantity. At that point, Perry crossed the street with Jonathan Stokley and Hunn Hadley, and the trio combined cocaine until they had the amount Patton had agreed to purchase. Stokley and Hadley were both juveniles at the time. Perry then sent Stokley to deliver the cocaine to Patton. Patton handed Stokley the agreed upon price in exchange for the cocaine. Stokley then returned to Perry and gave him the money. (Count 6, charging only Perry.)
 
 
 10
 4. On September 7, Agent Patton met with Vernon Armstrong, who agreed to sell him some crack cocaine. (Count 8.) An hour later, Patton saw Darren Armstrong, who offered to sell him an eighth of an ounce for $200. Darren then left and returned with two packets. Patton purchased one packet from Darren. (Count 7, charging only Darren Armstrong.)
 
 
 11
 5. On January 6, 1990, Agent Patton met with defendants Keith Murphy and Tyrus Blalock, along with two other persons not named in the indictment. Patton told them he was looking for Darren. When they asked why, Patton responded that he wanted a relatively large quantity of cocaine. The group responded that no one had any cocaine. Later that evening, as Patton continued to look for Darren, Blalock approached Patton and asked if he still was looking for cocaine. Patton told him he wanted half an ounce. Blalock said he could get it and the price would be $650. Defendant Murphy then handed Blalock a plastic bag containing a white powder, and Blalock handed it to Patton. Patton gave Blalock $650. The powder was later tested and found not to be cocaine.
 
 
 12
 6. On January 26, 1990, Officer Porter, an investigator with the Dyersburg Police Department, received information that defendant William Perry was carrying crack cocaine in a pill bottle in his jacket pocket. Porter then located Perry. Porter testified that when Perry saw Porter, Perry took a pill bottle from his pocket and tossed it on the ground. After Perry was apprehended, Porter located the discarded pill bottle, which contained 24 rocks of crack cocaine.
 
 
 13
 7. On February 15, 1990, police arrested Darren Armstrong after executing a search warrant at his house. In the search, police found 114 rocks of crack cocaine (Count 14), an amount of cocaine powder (Count 15), and a loaded Smith & Wesson .357 revolver (Count 13).
 
 
 14
 Evidence also was introduced concerning attempted bribery of police officers. Officer Porter had a conversation with Darren Armstrong in the halls of the Dyer County Courthouse on December 11, 1989, in which Darren told Porter that Porter could earn $600 a week selling cocaine for him. Porter replied that he would consider the offer and get back to him. Porter immediately reported the conversation to his supervisors. Porter and Darren Armstrong spoke again on January 9, 1990. This time, Officer Porter recorded the conversation. Armstrong indicated that he wanted protection in exchange for $800 a week. Six days later, in "crack alley," Porter was approached by defendant Keith Murphy, who inquired about Porter's conversations with Darren. Murphy urged Officer Porter to take Darren's offer seriously. On February 14, 1990, Investigator Joe McDowell was processing and booking Terry Warren at the Dyersburg Police Station, when Warren began talking about the "heat" being put on the drug trade in Dyersburg. Terry Warren then offered money to Investigator McDowell in exchange for protection. This conversation also was recorded.
 
 
 15
 In addition to the evidence concerning the various drug possessions and transactions and the attempted bribing of officers, there was evidence of two shootings in crack alley. On October 31, violence erupted in crack alley and the surrounding area. The Tennessee Highway Patrol provided helicopter flights over the area to illuminate the neighborhood. Sometime between 7:00 and 8:00 p.m., someone on the ground fired at a helicopter. Approximately two and one-half hours later, the rear window of a manned police patrol car was shot out. Various individuals testified that Darren Armstrong was seen in the area with a 9mm semi-automatic pistol, and one individual testified that Darren had been seen shooting in the air at the same time that the police helicopter was shot. An atomic absorption analysis test was performed on Darren's left and right hands at 12:45 a.m. on November 1. Both hands tested positive for gun powder. Count 9 charged Darren Armstrong with carrying a handgun in relation to a drug trafficking crime, and specifically referenced the shooting of a police vehicle. Count 10 charged Darren Armstrong with carrying a handgun in relation to a drug trafficking crime, specifically referencing the shooting of the police helicopter. Count 11 charged Darren with attempted destruction of an aircraft in the jurisdiction of the United States, a violation of 18 U.S.C. Sec. 32. The jury acquitted Armstrong of the offense charged in Count 9, but convicted him of the offenses charged in Counts 10 and 11.
 
 
 16
 The jury convicted all of the other defendants with respect to all of the charges, with the exception of Rodney Turner, who had been charged only in Count 1; he was acquitted.
 
 II.
 
 17
 The Sufficiency of the Evidence to Support the Conspiracy Convictions
 
 
 18
 A conspiracy exists when two or more persons agree to participate in a collective venture directed toward a common goal. United States v. Warner, 690 F.2d 545, 549 (6th Cir.1982). We find that, after viewing the evidence in the light most favorable to the government, there was sufficient evidence for the jury to conclude that each of the defendants was guilty of the conspiracy charged in Count 1. We note that the evidence was the weakest against Rodney Turner, the one defendant the jury found not guilty. We have set out the facts supra, in the manner in which a jury could properly view them. We do not revisit credibility determinations. If the jury believed all of the government witnesses, there was sufficient evidence from which they could conclude that all of the defendants except Turner were part of the conspiracy.
 
 III.
 Alleged Pretrial Errors
 
 19
 A. Suppression of Evidence Seized in the Search of Darren's Home
 
 
 20
 Darren Armstrong argues that the district court improperly denied his motion to suppress the evidence found in his residence. The affidavit for the search warrant alleged that a confidential informant, who had provided reliable information in the past, had informed the signing officer that a Tote-Vision video player with a specific serial number could be found in Darren's house. This video player had been reported stolen from a local store. Darren argues that the allegations in the affidavit for the search warrant were false and that the evidence thus should have been suppressed.
 
 
 21
 A defendant who challenges the veracity of statements made in an affidavit that formed the basis for a warrant has a heavy burden. His allegations must be more than conclusory. He must point to specific false statements that he claims were made intentionally or with reckless disregard for the truth. He must accompany his allegations with an offer of proof. Moreover, he also should provide supporting affidavits or explain their absence.
 
 
 22
 United States v. Bennett, 905 F.2d 931, 934 (6th Cir.1990) (citations omitted). The district court held a Franks[1] hearing and determined that the statements in the affidavit were not intentionally false or made with reckless disregard for the truth. We review this determination under the clearly erroneous standard. United States v. Henson, 848 F.2d 1374, 1381 (6th Cir.1988), cert. denied, 488 U.S. 1005 (1989).
 
 
 23
 During the Franks hearing, the defendant requested that a record be made of the name of the confidential informant who provided the information. The government supplied this name to the court in camera, and the court ordered the transcripts of the discussions sealed. However, counsel for Darren Armstrong obtained a copy of this transcript and unknowingly passed it on to her client. The confidential informant was Darren's sister, Sherry Armstrong.
 
 
 24
 Officer Porter testified that Sherry Armstrong called and told him that Darren had purchased a video player, not a recorder but a player, and that she thought it was stolen from the Big Lots store. Officer Porter further testified that Sherry told him she had seen the player in Darren's apartment two days earlier. Officer Porter then called the Big Lots store and the manager told him that a video player, not a recorder, had been stolen. The manager gave Officer Porter the serial number. Officer Porter then called Sherry, read her the serial number, and asked if it was in Darren's house. She replied "uh-huh." During her testimony at the suppression hearing Sherry used "uh-huh" to represent an affirmative answer.
 
 
 25
 Evidence was introduced that showed Sherry Armstrong was confronted by her brother, Darren. Sherry immediately called Officer Porter and, after further discussions, she was given $900 from the Dyersburg Police Department and the Tennessee Bureau of Investigation for relocation expenses. One of the conversations, in which Officer Porter and Sherry Armstrong discussed the information she had provided and the subsequent disclosure of her identity, was tape recorded. That recording was introduced at the suppression hearing. In the taped conversation, when Officer Porter asked whether he had called her, described the tape player, provided the serial number, and she had advised him that was the tape player in Darren's apartment, she responded "uh huh."
 
 
 26
 Once the identity of the informant was known, counsel for Darren Armstrong called Sherry as a witness. She testified that she did not recall telling Officer Porter that the player was at Darren's residence. On cross examination, she admitted telling Officer Porter that she had learned Darren Armstrong had purchased a stolen video player and that the player was in Darren's apartment, but she stated she made that call the day Darren was arrested, not before. The affidavit is dated February 15, the same day the warrant was executed and Darren was arrested.
 
 
 27
 Darren contends that the testimony of Sherry Armstrong at the suppression hearing shows Officer Porter jumped to "unwarranted conclusions," but we disagree. Sherry Armstrong testified only after being confronted by her brother. The district court was not clearly erroneous in concluding that the affidavit for the warrant was not based on intentional or reckless falsehoods. Darren Armstrong's motion to suppress the evidence found in the search of his home was properly denied.
 
 B. Severance
 
 28
 Defendants Parker, Warren, Perry, Murphy, and Vernon Armstrong all argue that the district court erred in denying their various motions for severance made pursuant to Rule 14 of the Federal Rules of Criminal Procedure. These motions were made prior to and during trial. The government asserts that this issue has been waived by the defendants because of their failure to renew their motions at the close of the evidence. This court has held "that a severance motion will be deemed waived if it is not renewed at the end of the evidence." United States v. Swift, 809 F.2d 320, 323 (6th Cir.1987). We need not address the issue of waiver, however, because we find that the district court did not abuse its discretion in denying defendants' motions for severance. The "defendants bear the burden of making a strong showing of factually specific and compelling prejudice resulting from a joint trial." United States v. Warner, 971 F.2d 1189, 1196 (6th Cir.1992). A defendant must show more than that he would have had a better chance at an acquittal if he had been tried separately. Id. In order to reverse a conviction, a defendant must establish undue, substantial, or compelling prejudice. While the general rule is that persons indicted together should be tried together, even if the evidence on one joined count is separable and distinct from the evidence on another, the evidence of one crime or series of crimes must be related to the others.
 
 
 29
 This court will not reverse a denial of a motion to sever unless the district court abused its discretion. United States v. Davidson, 936 F.2d 856, 861 (6th Cir.1991). Defendants argue on appeal that they suffered from the "spillover effect" of being tried with Darren Armstrong. They contend that they suffered prejudice from the introduction of evidence concerning the shooting of the helicopter and the patrol car, the evidence pertaining to alleged bribes attempted by Darren Armstrong, and the evidence of threats against a witness. Given all of the evidence presented in this case, however, we cannot say that defendants' trial was fundamentally unfair. All of the crimes charged were related to one another. The mere fact that there was no evidence offered linking each defendant to each criminal act does not warrant severance. "[A] jury is presumed capable of sorting out evidence and considering each count and each defendant separately...." Swift, 809 F.2d at 323. The jury in this case showed that capability by acquitting Rodney Turner.
 
 
 30
 We also reject Vernon Armstrong's additional argument concerning the prosecution's use of "Mr. Armstrong" when referring to Darren Armstrong. Vernon's counsel consistently objected to this practice and the reference was clarified. We find it clear from the record that Darren was the organizer of this group and that references to Mr. Armstrong clearly were to Darren Armstrong. When a witness discussed Vernon Armstrong, he was not referred to as "Mr. Armstrong." The use of "Mr. Armstrong" did not result in any prejudice.
 
 C. Selective Enforcement
 
 31
 On September 28, 1992, several months after the trial in this matter had been concluded, defendant Darren Armstrong filed a motion to dismiss, in which he claimed improper selective enforcement. Defendants Keith Murphy and Terry Warren filed motions to adopt. The motion to dismiss alleged that the prosecution was the result of a racially motivated investigation. The district court denied this motion without a hearing. Defendants argue that a hearing is required under Federal Rule of Criminal Procedure 12. Rule 12, however, requires that certain issues be raised before trial. Among these issues is any defense or objection "based on defects in the institution of the prosecution." Fed.R.Crim.P. 12(b)(1). The rule further provides that "[f]ailure by a party to raise defenses or objections ... which must be made prior to trial ... shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver." Fed.R.Crim.P. 12(f). Defendants have failed even to argue some justification for their delay in filing this motion. Therefore, we find the district court did not err in dismissing this motion without a hearing.
 
 
 32
 Additionally, we would note that this issue appears to be foreclosed by United States v. Anderson, 923 F.2d 450 (6th Cir.), cert. denied, 499 U.S. 980, 111 S.Ct. 1633 (1991). Defendants argue that selective prosecution occurred as the result of a selective investigation by the officers. In Anderson, the defendant alleged selective prosecution based on selective enforcement on the part of the sheriff of Haywood County, Tennessee. This court held that selective prosecution occurs when a prosecutor singles out a person belonging to an identifiable class for prosecution, initiates the prosecution with a discriminatory purpose, and the prosecution has a discriminatory effect on the group to which the defendant belongs. 923 F.2d at 453. Proof of selective prosecution cannot be proven merely by evidence of an alleged selective pattern of investigation by a state police agency.
 
 IV.
 Alleged Errors During Trial
 
 33
 A. Conflict of Interest With Jonathan Stokley
 
 
 34
 Darren Armstrong argues that the district court erred in finding that no conflict of interest existed for Darren's counsel with respect to a potential witness, Jonathan Stokley. We assume this to be an argument that he was denied effective assistance of counsel based on an alleged conflict of interest or, alternatively, denied a fair chance to present a defense because his counsel was hindered by a conflict of interest.
 
 
 35
 Darren Armstrong was found to be indigent, and a federal defender was appointed to represent him. Jonathan Lamont Stokley was an unindicted co-conspirator in this case. Shortly before the trial of this case, Stokley was indicted for perjury. A magistrate found Stokley to be indigent, and a federal defender was appointed to represent him. Approximately one-half hour later, the attorney for the government learned that a federal defender had been appointed for Stokley. He immediately called the Federal Defender's Office and spoke with Ed Duke, the Federal Defender for the Western District of Tennessee. Duke indicated that Stokley was still in the office at that time. Duke was advised that Stokley was a potential witness in the present case and that Duke would need to withdraw. The government filed a motion to disqualify Duke from representing Stokley in the perjury case.
 
 
 36
 The district court held a hearing regarding the alleged conflict of interest. At the hearing, the district court questioned both Duke and Ms. Ferguson, the federal defender who was representing Darren Armstrong. Ferguson stated that she had never talked with Stokley. Duke denied ever having shared any privileged information with Ferguson regarding what Stokley told him about the charges in Stokley's indictment. Duke further testified that he did not communicate anything to Ferguson regarding what Stokley's testimony would be relevant to those charges. Duke also stated that, if Stokley was called by either party, his advice to Stokley would be not to testify because the testimony could incriminate him. The court found that Duke had not shared any confidential information with Ferguson, and that therefore no conflict existed. The court then suggested that another attorney be appointed to advise Stokley whether or not to testify in the present case.
 
 
 37
 Newly appointed counsel advised Stokley to take the "Fifth Amendment" if he were called to testify by any party in this case. Counsel for Darren Armstrong argued to the court that, even though Duke no longer represented Stokley, the Federal Defender's Office had an ongoing duty to its former client not to prejudice his interests. On that basis, counsel for Darren Armstrong argued she was unable to call Stokley as a witness. Stokley never was called as a witness for any party. Ferguson made no offer of proof regarding what questions she intended to ask Stokley or how his testimony would be helpful to her client. Later in the proceedings, Ferguson again acknowledged that she had no other conversations with Duke and that no confidential information had been disclosed.
 
 
 38
 The government maintains that no actual conflict existed, no privileged information was ever exchanged, and any conflict of interest was eliminated by appointment of new counsel. There is a presumption that an attorney has shared privileged information with others in his or her law firm; however, this presumption can be rebutted if the firm has constructed a "Chinese Wall" to protect against the flow of confidential information. Schiessle v. Stephens, 717 F.2d 417, 421 (7th Cir.1983). Defendant maintains, without citing any authority, that "the Public Defender office is not able to maintain such a discipline[.]" (Darren's Brief at 35.)
 
 
 39
 We find in the particular circumstances of this case, if any error occurred, it was harmless error as a matter of law. There was absolutely no indication that Stokley would have done anything other than refuse to testify based on his Fifth Amendment rights or that any privileged communications were exchanged within the Federal Defender's Office.
 
 
 40
 B. The Testimony of Mary Bunkley was Properly Allowed
 
 
 41
 Defendants Parker, Perry, and Vernon Armstrong argue that the district court erred by failing to declare a mistrial or, in the alternative, by refusing to strike the testimony of Mary Bunkley. Bunkley was called as a witness for the government. She testified that she had been addicted to crack cocaine during 1989 and 1990 and that she had purchased cocaine from all of the defendants at one time or another. She testified that she supported her habit by writing bad checks. Bunkley also testified concerning the controlled buys in which she participated.
 
 
 42
 Defendants argue that, because Bunkley could not recall specific dates of purchases and because an indictment for bad check writing was pending against Bunkley for checks written after the termination of the alleged conspiracy, her testimony was wholly unreliable and should have been stricken. Defendants' arguments, however, concern Bunkley's credibility, which was for the jury to decide. Further, even if we ignored Bunkley's testimony, we would not alter our conclusion that there was sufficient evidence from which to base the finding of guilt.
 
 
 43
 At the time of sentencing, the district court found that Bunkley's testimony was not sufficient or specific enough to use for purposes of calculating sentences under the sentencing guidelines. Defendants argue that this finding indicated her testimony lacked the minimum indicia of reliability required for use in sentencing. United States v. Robison, 904 F.2d 365, 371 (6th Cir.), cert. denied sub nom. Smoot v. United States, 498 U.S. 946 (1990). Defendants accordingly contend that Bunkley's testimony lacked the minimum indicia of reliability and, thus, should have been stricken. We reject this contention for two reasons. First, the district court's sentencing finding concerned the specificity, not the veracity, of Bunkley's testimony. Second, even if the district court had found her testimony unreliable, it does not necessarily follow that the testimony should have been stricken, since it is the province of the jury to consider her credibility on its own.
 
 
 44
 C. Defendant Rodney Turner's Grand Jury Testimony
 
 
 45
 Defendants Parker, Perry, and Vernon Armstrong argue that it was error for the district court to allow the government to read to the jury redacted grand jury testimony of defendant Rodney Turner. Defendants, however, fail to cite the transcript page or pages where such testimony was read, and we can find none. The government maintains that such a citation was omitted because the testimony never occurred. Although the court did rule that such testimony was admissible, the defendants have failed to show that it was actually read to the jury.
 
 D. Ivory Brown's Testimony
 
 46
 Defendants Parker, Perry, and Vernon Armstrong contend that the district court erred by admitting certain testimony concerning threats received by one government witness, and that the district court erred by not granting their motions for a mistrial based on this testimony. Ivory Brown was the individual who had been incarcerated with Darren Armstrong. Brown testified before the grand jury, and eventually at trial, that during his 17 days in a work-release program he ran messages between Vernon Armstrong and Darren concerning what was happening on the streets regarding "Darren's money."
 
 
 47
 On February 4, 1993, the government intended to call Brown as a witness. However, Brown had advised the government attorney that he would not testify because he and his family had been threatened. At trial, the jury was dismissed and Brown took the stand. He described two different telephone calls in which threats against both himself and his family were made. He stated he was told that if he "testified wrong" he would not make it back to Brownsville, where he lived, and that he should not make any "wrong" testimony if he cared about his little sisters. When the judge asked him if he would testify if so ordered, Brown said he would not. After extensive discussion among the defense attorneys, the government attorney, and the court, the court decided to dismiss the jury for the day and to continue the matter in the morning after reviewing Brown's grand jury testimony and the relevant case law. The judge told Brown to think about the whole matter overnight and to come back the next morning.
 
 
 48
 The following morning Brown did not appear, and the government requested that a warrant be issued for his arrest. However, he appeared later that day. Extensive discussions were again held. The jury was dismissed and Brown was called to the witness stand. Brown reiterated that he was going to refuse to testify because of the threats to his younger sisters and because of an incident that had occurred that morning. Brown explained that, as he pulled his car out of driveway to come to court that morning, two of the car tires fell off and two were leaning, because the lug nuts had been removed from each of the tires. The judge responded that if Brown refused to testify he would be held in contempt and could be jailed. The attorney for the government and the attorneys for the defendants were then allowed to voir dire Brown about his prior grand jury testimony. Brown stated that he did not remember making many of the statements. Brown also denied having any knowledge of drug dealing involving the defendants. The court again questioned Brown about his resolve not to testify and Brown did not waver.
 
 
 49
 The court then ruled, over the objections of defense counsel, that it was going to bring in the jury to allow the government to ask Brown if he was willing to testify, and that, if Brown refused to testify, the government would be allowed to ask him why. After calling Brown to the stand and establishing that he would not testify even under threat of contempt, the following exchange occurred:
 
 
 50
 Q. Is it true that you've indicated to the court that your reason for refusing to testify is because last week on Monday and on Tuesday you received some phone calls?
 
 
 51
 A. Yes.
 
 
 52
 Q. And is it true that in one of those phone calls you were advised that if you testified wrong, that you wouldn't make it back to Brownsville alive?
 
 
 53
 A. Yes.
 
 
 54
 Q. And is it true that in one or both of those phone calls the lives of your younger sisters were threatened?
 
 
 55
 A. Yes.
 
 
 56
 Q. How old are your younger sisters, Mr. Brown?
 
 
 57
 A. 16 years old and 17.
 
 
 58
 Q. And is it because of those threats to your younger sisters that you are refusing to testify here today?
 
 
 59
 A. Yes.
 
 
 60
 (App. 803.) Brown also was asked to describe the incident that morning with his car. After the court denied a motion for a mistrial from all the defendants, the court ordered Brown to testify, but he still refused. The court held Brown in contempt and appointed a lawyer to represent him. The trial recessed and did not resume until February 20. When the trial resumed, Brown had decided to testify and related what had occurred when he was incarcerated with Darren Armstrong. Defense counsel used Brown's voir dire testimony from February 5 to impeach his testimony.
 
 
 61
 Defendants argue that allowing Brown to testify concerning the threats he had received and the tampering with his car was so prejudicial it denied them a fair trial. The government cites United States v. Maddox, 944 F.2d 1223 (6th Cir.), cert. denied, 112 S.Ct. 610 (1991), as support for its position that this evidence was relevant and properly admitted. Maddox involved a situation where a witness felt she had been threatened by the defendant during a break in the witness' testimony and when the attorneys were engaged in a sidebar conference with the judge. The defendant allegedly mouthed the words "you're dead" to her. The witness claimed this distracted her to the point where she could no longer concentrate on her testimony. The court found that she had not been threatened, but that she believed she had been threatened, and that therefore the evidence of the alleged threat was admissible because it helped explain the nature of her subsequent testimony.
 
 
 62
 In this case, however, the defendants do not challenge the admissibility of the fact of the threats, a challenge we would reject. Brown's grand jury testimony, given prior to the alleged threats, conflicted with the testimony he gave after the alleged threats. Thus, the fact that he was threatened was relevant to show why his testimony might not have been entirely consistent. The government, however, does not address the crux of defendants' argument--that the testimony concerning the threats was so prejudicial it denied them a fundamentally fair trial. Two of the three defendants who raise this issue on appeal were implicated by Brown as employees of Darren's. Brown testified that Perry worked for Darren and that, while Darren was in prison, Vernon Armstrong was taking care of Darren's business. Defendant Parker was not implicated by Brown's testimony.
 
 
 63
 "A defendant may move for a mistrial where there is a legitimate claim of seriously prejudicial error[,]" such that the defendant is unable to obtain a fair trial. United States v. Moore, 917 F.2d 215, 220 (6th Cir.1990), cert. denied, 499 U.S. 963, 111 S.Ct. 1590 (1991). "[T]he decision whether a trial has been so tainted by prejudicial testimony that a mistrial should be declared lies within the discretion of the district court." United States v. Reed, 724 F.2d 677, 679-80 (8th Cir.1984). We will reverse that decision only if the trial court abused its discretion. Moore, 917 F.2d at 220.
 
 
 64
 If Brown had never testified, we would be compelled to say that the court erred in allowing the testimony as to threats and that the error was serious enough to result in a mistrial. Since Brown did testify, however, we find that the error in allowing the testimony as to threats before Brown's substantive testimony was heard was harmless. Defense counsel were allowed to cross-examine Brown as to his voir dire testimony, and the government was entitled to explain the discrepancies in Brown's testimony by referencing the threats. We do not intend to establish any rule by this holding that extends beyond the very particular facts of this case.
 
 E. Alleged Improper Cross-Examination
 
 65
 Darren Armstrong argues that he and a defense witness, Michael Nance, were improperly cross-examined by the government. Nance was called by counsel for Darren Armstrong and on direct examination was asked, among other things, if he had ever sold drugs for Darren or if he had ever seen Sandy Taylor or Jonathan Stokley sell drugs for Darren. Nance responded in the negative. On cross-examination, the government asked if he was aware that Sandy Taylor had testified under oath that he had, in fact, sold drugs for Mr. Armstrong. This question was not hearsay, because it was not offered for the truth of the matter asserted. Also, Taylor had testified earlier, so there was a factual predicate in the record for the question.
 
 
 66
 The government also asked Nance if Darren had ever given him a beeper. When Nance responded in the negative, the following exchange occurred:
 
 
 67
 Q. Mr. Kenny Vaughn is your relative?
 
 
 68
 A. Supposed to be, yeah.
 
 
 69
 Q. He is supposed to be. And you understand him to be?
 
 
 70
 A. Yeah.
 
 
 71
 Q. If he said that Mr. Armstrong gave you a beeper, what would you say to that?
 
 
 72
 A. It's my word against his. He don't know what he is talking about. I didn't have no beeper.
 
 
 73
 (App. 905.)
 
 
 74
 After an objection from counsel was overruled, the following testimony occurred:
 
 
 75
 Q. Now, Mr. Nance, it's your testimony that Kenny Vaughn had said that you had a beeper and you were wearing it for Mr. Armstrong, that would just be your word against his, is that right?
 
 
 76
 A. I didn't have no beeper.
 
 
 77
 Q. Huh?
 
 
 78
 A. He never did see me with no beeper.
 
 
 79
 Q. He didn't see you with a beeper?
 
 
 80
 A. No.
 
 
 81
 (App. 906.)
 
 
 82
 Again, defendants' objection is not well taken, as Kenny Vaughn testified at trial in the manner indicated by the government and Nance was being properly confronted with this testimony.
 
 
 83
 The government also questioned Nance concerning Jonathan Stokley. After establishing that Nance knew Stokley, the government asked Nance, if Stokley had "admitted to Investigator Joe McDowell that he had sold cocaine for Mr. Armstrong, would you have any knowledge of that?" Nance responded, "I have no knowledge of anything." (App. 907.)
 
 
 84
 This reference to the out-of-court statement made by Jonathan Stokley did not implicate the hearsay rule, because it was not offered for the truth of the matter asserted. Fed.R.Evid. 801(c). The statement by Stokley was referenced to show that, although Nance may not have seen Stokley sell drugs, it still could be possible Stokley was selling drugs. We do not find defendant's hearsay argument persuasive. The prosection's question was nonetheless improper, because there was no factual predicate in the record for the question. We deem this to be a harmless error, however.
 
 
 85
 Defendant next argues that he was improperly cross-examined by the government. Darren Armstrong took the stand in his own defense and denied being a drug dealer. During cross-examination, the following exchange occurred:
 
 
 86
 Q. Mr. Armstrong, your lawyer asked you about Lamont Stokley?
 
 
 87
 A. Yes, sir.
 
 
 88
 Q. You, you know who Mr. Lamont Stokley is?
 
 
 89
 A. Yes, sir.
 
 
 90
 Q. Did you ever deliver any drugs to him?
 
 
 91
 A. No, sir.
 
 
 92
 Q. Did you ever see him selling drugs?
 
 
 93
 A. No, sir.
 
 
 94
 Q. Did he have any knowledge of you using drugs?
 
 
 95
 A. Lamont, I don't think so, no, sir.
 
 
 96
 Q. So, if he came here and testified, that would be his testimony that he--you never had any drug dealings with him, wouldn't that be his testimony?
 
 
 97
 A. Yes, sir, if he told the truth it would be.
 
 
 98
 Q. And he wouldn't have any knowledge whatsoever of your drug dealing because it didn't exist, correct?
 
 
 99
 A. That's right.
 
 
 100
 Q. That's despite the fact that he gave a tape recorded statement to Investigator Joe McDowell where he said that he was selling drugs for you?
 
 
 101
 (App. 945-46.) Darren Armstrong never answered the last question because counsel objected and, after a lengthy sidebar conference, the question was not asked again. Here, we again find error in the questions because of the lack of a factual predicate in the record, but find the error to be harmless in light of all of the other substantial evidence in the record bearing on the guilt of Darren Armstrong.
 
 
 102
 Darren Armstrong also argues that questions asked during his cross-examination concerning statements made by Sandy Taylor were improper because Taylor did not testify. Taylor, however, testified at length and was subject to cross-examination. Darren also objects to a line of questioning concerning allegations that Rodney Turner and Shon Pierce sold cocaine for Darren. When Darren denied these allegations, the government attorney asked him if he would maintain that Turner and Pierce would have been lying if they had so testified before the grand jury. Armstrong responded that they would have been lying.
 
 
 103
 The two cases relied on by defendant do not support his argument. In United States v. Phillip, 948 F.2d 241, 250 (6th Cir.1991), cert. denied, 112 S.Ct. 1194 (1992), we concluded that the failure of the government to turn over a videotape was not error, because the videotape was not discoverable under Brady v. Maryland, 373 U.S. 83 (1963). We reasoned that the statements in the videotape could not have been offered for impeachment purposes because the declarant did not testify at trial. In United States v. Gomez-Lemos, 939 F.2d 326, 330 (6th Cir.1991), we held that the Confrontation Clause was violated by allowing the uncross-examined grand jury testimony of two alleged co-conspirators to be read into evidence pursuant to Fed.R.Evid. 804(b)(5). The alleged improper cross-examination of Darren Armstrong, however, does not involve reading grand jury testimony into evidence.
 
 
 104
 Darren testified that he was not a drug dealer and that the government witnesses who testified against him were lying in their testimony. The government's questions regarding Shon Pierce and Rodney Turner were used to show that Darren called everyone who testified against him a liar. They were not used for the truth of the matter asserted in the statement, i.e., that they sold drugs for Darren.
 
 
 105
 F. Statements by the Prosecutor During Closing Arguments
 
 
 106
 Darren Armstrong argues that a statement made by the prosecutor during closing arguments denied him a fair trial. The prosecutor stated that the reason the defendants rented automobiles for their trips to Memphis is that the government has "a bad habit of confiscating cars when they are used in a drug deal." (App. 1014.) However, "[i]n order to deny defendant a fair trial, prosecutorial misconduct and improper argument must be 'so pronounced and persistent that it permeate[s] the entire atmosphere of the trial.' " United States v. Castro, 908 F.2d 85, 89 (6th Cir.1990) (citation omitted). The statement was an accurate statement of the law: the government is authorized to, and does, seize vehicles used in a drug trade. See 21 U.S.C. Sec. 881. Even if the statement by the prosecutor was improper, and we do not find that it was, its effect was not so prejudicial as to deny Darren Armstrong a fair trial.
 
 G. The Reading of Testimony to the Jury
 
 107
 During jury deliberations, the court received a note indicating that a juror wanted a copy of Agent Patton's testimony concerning the events of August 7. After discussion with counsel, during which counsel for defendant Parker objected to any reading of testimony, the court advised the jury that no transcript was readily available but that one could be made available. The court noted that if they could be more specific, the court would attempt to comply with their request. A short time later, the jury sent a request to the court which indicated they only wanted Patton's testimony concerning defendant Parker's involvement in the events of August 7, and that "[i]t would be agreeable just to have this read to us." (App. 1036.) Counsel for Parker objected. The court indicated to counsel that it would comply with the jury's request and that it also would tell the jury they should consider that evidence along with all other evidence in the case. The court reporter read the requested testimony, but the court neglected to give the cautionary instruction. After the jury left the courtroom, counsel began their objections, indicating that the reading was not complete. Before the matter could be addressed by the court, the jury had reached a verdict.
 
 
 108
 "In reviewing a district court's decision to read testimony to the jury, this court is bound by an abuse of discretion standard." United States v. Padin, 787 F.2d 1071, 1076 (6th Cir.), cert. denied, 479 U.S. 823 (1986). Defendant Parker argues that the district court abused its discretion in re-reading selected portions of this testimony to the jury without giving a cautionary instruction. In Padin, we noted that there are two dangers in reading testimony to a jury: undue emphasis may be placed on the testimony and/or the limited testimony may be taken out of context. Id.
 
 
 109
 Defendant essentially maintains that, without the cautionary instruction, these dangers are insurmountable; if testimony is going to be re-read, "then cautionary instructions are required and must be given." (Parker's Brief at 14.) Defendant cites no law for this proposition and we can find none. Although cautionary instructions are certainly advisable, they are not required. The initial instructions given in this case advised the jury that they should "take all of the evidence introduced in this case and give it full, fair and impartial consideration." (App. at 1025.) Additionally, in Padin we noted that the dangers in reading testimony to a jury "are escalated after the jury has reported its inability to arrive at a verdict." 787 F.2d at 1077. There was no indication in this case that the jury was deadlocked. The speed with which they returned their verdict suggests that they simply wished to confirm their recollection of Agent Patton's testimony.
 
 V.
 Jury Instructions
 A. Multiple Conspiracy
 
 110
 Defendants Darren Armstrong, Terry Warren, Tyrus Blalock, and Keith Murphy argue that the district court erred by not giving an instruction regarding multiple conspiracies. Since none of these defendants objected to the district court's conspiracy instructions, we review only for plain error. When a party fails to object to a jury instruction at trial, reversal is required only in those exceptional circumstances where necessary to avoid a miscarriage of justice. United States v. Hatchett, 918 F.2d 631, 643 (6th Cir.1990), cert. denied, 111 S.Ct. 2839 (1991).
 
 
 111
 "The fact that a conspiracy can be divided into distinct sub-groups does not mean that there is more than one conspiracy. As long as the different sub-groups are committing acts in furtherance of one overall plan, the jury can still find a single, continuing conspiracy." Warner, 690 F.2d at 550 n. 8. Although this was admittedly a loose confederation of a number of different individuals, we believe that the record viewed as a whole reflects the government's theory that this was one continuing conspiracy.
 
 B. Lesser Included Offense
 
 112
 In his statement of issues, Darren Armstrong contends that the district court erred with respect to a lesser included offense charge. He makes no argument about this issue, however, and the requested instruction appears to have been given. (App. 1023-24.)
 
 
 113
 C. Instructions Concerning the Three Sec. 924(c) Counts
 
 
 114
 Count 9 charged Darren Armstrong with shooting at a police car and thus violating 18 U.S.C. Sec. 924(c) by using a handgun during and in relation to a violation of 21 U.S.C. Sec. 846. Darren was acquitted of this charge. Count 10 related to Armstrong shooting at a police helicopter and charged him with violating 18 U.S.C. Sec. 924(c) by using a handgun in relation to a violation of 21 U.S.C. Sec. 846. Darren was convicted of this charge. The violation of Sec. 846 referred to in these two counts was the conspiracy charged in Count 1.
 
 
 115
 Count 13 charged defendant with a violation of 18 U.S.C. Sec. 924(c) by using and carrying a firearm, specifically a .357 magnum, in relation to a violation of 21 U.S.C. Sec. 841(a)(1). Darren was convicted of this charge. The violation of Sec. 841(a)(1) in question was the Count 14 offense, which related to the crack cocaine found in the search of Darren's house.
 
 
 116
 Darren was sentenced to the statutory mandatory minimum of five years' custody on his first Sec. 924(c) conviction, Count 10, and to the statutory mandatory minimum of 20 years' custody on his second Sec. 924(c) conviction, Count 13.
 
 
 117
 Darren requested a charge that, if the jury determined he was guilty of simple possession on Count 14, then they must acquit him on Count 13. The district court denied this request. The court gave the following charge with respect to the three counts involving violations of Sec. 924(c):
 
 
 118
 Regarding Counts Nine and Ten, you must find Darren Armstrong committed the offense charge[d] in Count One, the conspiracy charge.
 
 
 119
 Regarding Count 13, you must find beyond a reasonable doubt that Darren Armstrong committed the crime charged in Count 14, that is possession with the intent to distribute cocaine base.
 
 
 120
 For you to find Darren Armstrong guilty of these crimes, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
 
 
 121
 First. That the defendant, Darren Armstrong, committed the crime charged--alleged in Counts One or 14. The court instructs you that possession with the intent to distribute cocaine base is a drug trafficking crime; and
 
 
 122
 Second. That the defendant, Darren Armstrong, knowingly used or carried a firearm during and in relation to the commission of the crime alleged in at least one of the Counts One or 14.
 
 
 123
 (App. 1021-22) (emphasis added).
 
 
 124
 Defendant proposed the following instruction:
 
 
 125
 In order to find the defendant, Darren Armstrong, guilty of the charges in Counts 9, 10, and 13, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
 
 
 126
 First: Regarding Counts 9 and 10, you must find beyond a reasonable doubt that Darren Armstrong committed the offense charged in Count 1, the conspiracy charge. If you find the defendant not guilty of Count 1, you must find the defendant not guilty as to Counts 9 and 10.
 
 
 127
 Second: Regarding Count 13, you must find beyond a reasonable doubt that Darren Armstrong committed the offense charged in Count 14, that is possession with the intent to distribute cocaine base. If you find the defendant not guilty of Count 14, you must find the defendant not guilty as to Count 13.
 
 
 128
 Third: In order to find the defendant, Darren Armstrong, guilty of Counts 9 or 10, you must find that he used or carried the firearm in these Counts during and [in] relation to the crime alleged in Count 1. In order to find the defendant, Darren Armstrong, guilty of Count 13, you must find that he used or carried the firearm in this Count during and in relation to the crime alleged in Count 14.
 
 
 129
 (App. 221-22.)
 
 
 130
 We review "jury instructions as a whole in order to determine whether they fairly and adequately inform the jury of the relevant considerations and provide a sound explanation of the applicable law to aid the jury in reaching its decision." United States v. Salisbury, 983 F.2d 1369, 1376 (6th Cir.1993). We will reverse a judgment only if the instructions, viewed as a whole, are confusing, misleading and prejudicial. Id. The district court is not required to use the exact language in a proposed instruction so long as the instruction ultimately given is accurate and sufficient. United States v. Martin, 740 F.2d, 1352, 1361 (6th Cir.1984), cert. denied, 472 U.S. 1029 (1985).
 
 
 131
 Defendant argues that the quoted portion of the court's instruction was confusing and misleading, and allowed the jury to convict him on Counts 10 and 13 for the carrying or the using of any firearm in relation to either Count 1 or Count 14, but not both. If the jury, for example, had convicted him on Counts 10 and 13 based only on the conspiracy charged in Count 1, then his 20-year sentence would be erroneous. We would need to remand for resentencing because there can be only one Sec. 924(c) sentence if only a single predicate offense is involved regardless of the number of weapons.
 
 
 132
 Defendant's argument is unpersuasive for several reasons. First, defendant was convicted of both Count 1 and Count 14. Second, the instruction given clearly sets out that Counts 9 and 10 require that the jury "must find Darren Armstrong committed the offense charge[d] in Count One," while Count 13 requires that the jury "must find beyond a reasonable doubt that Darren Armstrong committed the crime charged in Count 14." (App. at 1021) (emphasis added). In explaining the elements of a Sec. 924(c) offense, the instructions reference the predicate offenses involved, Count 1 or Count 14. While defendant's proposed instruction may have been a bit clearer on this issue, we do not find the instruction given to be misleading or prejudicial.
 
 VI.
 Sentencing
 A. Michael Lynn Parker
 
 133
 Parker was indicted on the conspiracy to distribute drugs charge and on one substantive drug count. He was convicted on both charges and sentenced to 85 months to be followed by eight years of supervised release. He objects to the district court's failure to grant him a two-level reduction as a minor participant in the conspiracy under U.S.S.G. Sec. 3B1.2. In overruling the defendant's motion to this effect, the sentencing judge found Parker "to be a moving force within his area of the conspiracy that was charged in this case."
 
 
 134
 "Role in the offense" is a traditional determination, made in every sentencing, which long antedates the Guidelines. Under the Guidelines, a "role in the offense" determination "is a factual one, which, upon appellate review, is subject to the clearly erroneous standard," United States v. Williams, 894 F.2d 208, 213-14 (6th Cir.1990), and Congress tells us that we "shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. Sec. 3742(e).
 
 
 135
 United States v. Schultz, 14 F.3d 1093, 1099 (6th Cir.1994).
 
 
 136
 Using the standards employed in Williams and in Schultz, after giving due deference to the trial judge's opportunity to assess relative culpability and the respective roles played in this drug conspiracy, we find no error in the district court's refusal to find Parker a minor participant. We also find no error in the district court's determination on acceptance of responsibility.
 
 
 137
 Next, Parker challenges inclusion, for sentencing purposes, his state arrest and conviction on April 10, 1989, for possession of cocaine.[2] This offense occurred well within the period of the alleged conspiracy set out in the indictment. The district court included the one point for this state offense in Parker's criminal history calculation based upon the government's position that this was a "separate offense," but without discussing the basis for this determination.[3] Since we will remand the matter of Parker's sentencing on a relevant conduct quantity of drugs involved issue, we make no determination on this "separate offense" question, but ask that the district court on remand set out briefly the basis of this decision relating to Parker's sentence.
 
 
 138
 The district court was then required to determine the quantity of drugs for which Parker would be held responsible in sentencing--not only on the substantive offense, but also for relevant conduct as a conspirator. Two of the principal witnesses dealing with quantity of drugs involved in this conspiracy were Mary Bunkley and Jack McGee, both of whom were addicts during the relevant period. The district court stated with regard to the Bunkley and McGee testimony at sentencing:
 
 
 139
 Now one of the big questions involved in this whole lawsuit is the testimony of Mrs. Mary Bunkley and the testimony of, I believe it is, Mr. Jack McGee. And all of the lawyers are very, very adamant about their testimony.
 
 
 140
 Here is how the court comes down on evaluation of their testimony. I think that obviously the jury considered their testimony. They had to just on the face of it.
 
 
 141
 But I have considerable difficulty in basing the sentencing of Mr. Parker on the testimony of these two folks simply because it's just not definite enough--it's not specific enough to tie them into the larger hundred and fifty to two hundred gram transactions the government argued.
 
 
 142
 (App. 1117) (emphasis added).
 
 
 143
 But I just find it, in all fairness, testimony the government presented which I think the jury could well accept and evaluate in terms of deciding, for example, the conspiracy issue. But I find it difficult to use it to go to the 36 level or whatever it is on the basis of the testimony. I just--during the course of, for example, Ms. Bunkley's testimony, I don't have any doubt in my mind that she became a victim in terms of becoming and [sic] addict, that she got drugs from these people. But I have serious questions about the credibility in terms of the amounts that she said that she got. The amounts that she said that she paid for it. The extent to which she was able to shoplift and cash checks in order to obtain the amount of drugs that she indicated that she used.
 
 
 144
 ... I just have an uneasy feeling about the sufficiency of it in terms of its definiteness for guideline purposes. And I'm being honest in just laying it out for you so the record will reflect that.
 
 
 145
 We have difficulty, in light of the above statement, in determining how the district judge arrived at the quantity of drugs that determined Parker's base offense level.[4]
 
 
 146
 Parker was found guilty of distributing, on August 7, 1989, 2.6 grams of cocaine. He was mentioned otherwise in the indictment only once as being one of several to obtain cocaine from the Memphis area to take to Dyersburg to transform to crack cocaine and distribute in the Dyersburg area. Parker is mentioned in our recitation of facts of specific sales and possession only in one episode with agent Patton involving one "eight ball" of cocaine. The government concedes that Parker was "not a leader in the conspiracy." Only Nathaniel Taylor testified about a specific role played by Parker.
 
 
 147
 A co-conspirator is not necessarily responsible for the total amount of cocaine involved in the conspiracy for purposes of establishing his base offense level. Rather, a participant is responsible for other conspirators' conduct only if that conduct was reasonably foreseeable to him and in furtherance of the execution of the jointly undertaken criminal activity.
 
 
 148
 ....
 
 
 149
 ... However, foreseeability is only one of the limitations on the ability of the court to charge one participant in a conspiracy with the conduct of the other participants. It has been argued that foreseeability alone provides scant practical limitation. "In the case of heroin and cocaine, each seller knows that every transaction requires an extensive network of importers and distributors handling large quantities." Stephen J. Schulhofer, Excessive Uniformity--And How to Fix It, 5 Federal Sentencing Reporter 169, 170 (1992). Another limitation on the court's ability to charge a defendant with the conduct of others is that the conduct must be in furtherance of the execution of the "jointly undertaken criminal activity."
 
 
 150
 The 1992 amendment to U.S.S.G. Sec. 1B1.3 and its commentary "clarifies and more fully illustrates the operation of this guideline." U.S.S.G., App. C. amend. 439.
 
 
 151
 United States v. Jenkins, 4 F.3d 1338, 1346 (6th Cir.1993) (citations omitted), petition for cert. filed, --- U.S.L.W. ---- (U.S. Jan. 19, 1994) (No. 93-7536).
 
 
 152
 As in the case of Jenkins, "the district court did not address, implicitly or explicitly, the scope of the criminal activity [defendant] agreed to jointly undertake ... [and] differentiate between [Parker] and other members of the [Armstrong] conspiracy." Jenkins, 4 F.3d at 1347. The district court did not, in short, set out the basis of relevant conspiratorial conduct and quantity of drugs for which Parker should be held personally responsible, particularly for one not a leader in the drug operation.
 
 
 153
 We, therefore, REMAND for resentencing and for clarification of the basis for sentencing Parker in this case.
 
 B. William Perry
 
 154
 Perry also was charged and convicted as a conspirator on one count of using a person under 18 years of age to distribute a small amount of cocaine and on another substantive count of possession with intent to distribute about two grams of crack cocaine.
 
 
 155
 Perry claims error in assessing a one-point level against him "for recruiting juveniles as workers." We believe there was sufficient evidence, however, to warrant the district court's action in this regard.
 
 
 156
 Perry also challenges the three-point level increase assessed for being a supervisor in the conspiracy. Perry's role with several juveniles, we believe, was sufficient for the district court to make a factual finding that Perry was a "manager or supervisor" in the criminal activity under U.S.S.G. Sec. 3B1.1. We find no clear error in this determination.
 
 
 157
 Perry's attorney at the sentencing hearing made the following observation:
 
 
 158
 I think that everyone is in an agreement that the proper base offense level for Mr. Perry is a 32, he has a criminal history category of three, which gives him a guideline range of a hundred and fifty-one to a hundred and eighty-eight months.
 
 
 159
 I would submit to Your Honor that as with all of the other defendants that this is a case appropriate for Your Honor to consider considering Mr. Perry to the low end of the guidelines....
 
 
 160
 ....
 
 
 161
 THE COURT: The court will grant that motion.
 
 
 162
 (App. 1176.) Accordingly, since the court did sentence Perry to 151 months, and since he raises no contention in his brief about the quantity of drugs for which he was charged, we AFFIRM the sentence imposed upon this defendant.
 
 C. Terry Warren
 
 163
 Warren also was charged as a conspirator and in three substantive drug distribution counts. Warren devoted only a few sentences in his brief to a single sentencing issue--whether he was properly deemed a supervisor in the conspiracy. Warren was found guilty on all four drug activity counts, and was named as a participant in several additional overt acts in the indictment (as recruiter and in connection with efforts to obtain police protection). Not only was Warren involved actively in distribution of drugs, but also he was shown by the evidence to have recruited Vaughn, a juvenile, to sell crack cocaine, "fronting" Vaughn to assist him in that enterprise. Whether the nature and degree of his participation and his exercise of control over others was sufficient to find Warren a manager or supervisor of the conspiracy, however, is unclear. The district court had only this to say in this regard:
 
 
 164
 [T]here was an organization here and a rather effective organization. And when one who is an adult recruits an 11 year old child to sell cocaine, the court couldn't, not in good conscience find him to be a minor player.... I think the court can infer that he was an organizer to the extent that he was a recruiter in this instance.
 
 
 165
 (App. 1160) (emphasis added).
 
 
 166
 The district court did not have the benefit of our elaboration on the meaning of this section of the guidelines set out in United States v. Gibson, 985 F.2d 860, 865-66 (6th Cir.), cert. denied sub nom. Baker v. United States, 113 S.Ct. 2981 (1993):
 
 
 167
 [F]actors a court should consider in determining whether section 3B1.1 applies include (1) the exercise of decision-making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others. U.S.S.G. Sec. 3B1.1, comment. (n. 3). The government bears the burden of establishing the factors supporting the enhancement by a preponderance of the evidence.
 
 
 168
 ....
 
 
 169
 ... The characteristics adduced by the government are insufficiently discriminating to pick out Baker and Gibson from the vast majority of everyday buyers and sellers of drugs. While we have indeed granted sentencing courts broad discretion in fitting Section 3B1.1 to the factual context before them, we have also indicated that more is required than a mere buyer/seller relationship.
 
 
 170
 We held in Gibson that a mere "middleman" in a drug distribution conspiracy is not sufficient to bring about application of Sec. 3B1.1(c). We believe that a remand for further consideration of this sentencing issue under Gibson standards is appropriate under the circumstances. Warren also did not challenge the quantity of drugs found attributable to him before the district court at the sentencing hearing or on appeal.
 
 D. Tyrus Blalock and Vernon Armstrong:
 
 171
 Since defendants Blalock and Vernon Armstrong raise no sentencing issues, we have no need to consider the sentences imposed, which are within statutory limits.
 
 E. Darren Armstrong
 
 172
 Darren Armstrong was deemed to be the leader of the conspiracy and we find no error in this determination by the district court. See Schultz, 14 F.3d 1093. He also does not raise a quantity of drugs question on the sentence imposed upon him in his brief.
 
 
 173
 Armstrong does present a serious challenge to the two consecutive sentences of five years and twenty years on the separate 18 U.S.C. Sec. 924(c) charges (counts 9, 10 and 13). Armstrong was acquitted on Count 9, in which he was charged with use of a firearm (shooting a handgun at a police vehicle) in connection with the drug conspiracy. In count 10, Armstrong was charged and convicted on the same date with use of a firearm (used to shoot a Tennessee Highway Patrol helicopter) in relation to the same conspiracy.[5] In count 13, Armstrong was convicted of use of a firearm in relation to his individual possession of cocaine with intent to distribute.
 
 
 174
 Count 13, unlike count 10, specified a particular Magnum revolver with respect to Sec. 924(c).[6] It also makes reference to a violation of 21 U.S.C. Sec. 841(a)(1), instead of 21 U.S.C. Sec. 846, a substantive drug offense, which relates to the conspiracy offense. With respect to the firearm charges, the government must connect a firearm possession or use to a particular drug trafficking offense. United States v. Henry, 878 F.2d 937 (6th Cir.1989).
 
 
 175
 We have held, in a comparable situation involving application of Sec. 924(c)(1) to two separate predicate offenses, that there is no constitutional problem of multiplicity of punishments provided the offenses "are distinct and require proof of facts not required by the other predicate." United States v. Nabors, 901 F.2d 1351, 1358 (6th Cir.) cert. denied, 498 U.S. 871, 111 S.Ct. 192 (1990). We concluded in Nabors that "two distinct violations of the statute trigger the subsequent sentence enhancement provisions of Sec. 924(c)(1)." Id. (emphasis added). We do not read Deal v. United States, --- U.S. ----, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993), to mandate a different result.
 
 
 176
 Accordingly, although the effect of the consecutive enhancements under Sec. 924(c)(1) is draconian, we AFFIRM the sentences imposed under this section. The predicate offenses involved in this case are separate and distinct, and they required proof of facts not required by the other predicate offense.
 
 
 177
 Since Darren Armstrong was deemed by sufficient proof to be the leader/organizer of the drug conspiracy, he also may be held responsible for foreseeing the consequence of a large quantity of cocaine being distributed during the relevant conspiracy period. We AFFIRM the sentence of Darren Armstrong, accordingly.
 
 F. Keith Murphy
 
 178
 Murphy was indicted only on the conspiracy to distribute drugs charge. He was convicted of that charge and sentenced to 151 months to be followed by eight years of supervised release. He objects to the district court's findings that: (1) he was a "supervisor" as set out in U.S.S.G. Sec. 3B1.1; (2) he obstructed justice as described in U.S.S.G. Sec. 3C1.1; and (3) the acts of his coconspirators were foreseeable. As stated earlier, the district court did not set out the basis of relative conspiratorial conduct and quantity of drugs for which Murphy should be held personally responsible. Accordingly, as to issue three, we will remand for resentencing for clarification of the basis for sentencing of Murphy in this case.
 
 
 179
 Under U.S.S.G. Sec. 1B1.3, however, a conspirator is not automatically charged with responsibility for all the narcotics funnelled through the conspiracy; quantities handled by other conspirators are attributed to a defendant only if the conduct of the other conspirators was "reasonably foreseeable" to the defendant and was within the scope of the criminal activity the defendant agreed jointly to undertake.
 
 
 180
 United States v. Obiukwu, --- F.3d ----, ----, Nos. 92-2051/2120, slip op. at 12 (6th Cir. Feb. 3, 1994) (citation omitted).
 
 
 181
 Regarding the other two issues, we hold that the district court's factual findings are not clearly erroneous and we affirm. Section 3B1.1(c) of the Sentencing Guidelines provides for a two-level increase in offense level "if the defendant was an organizer, leader, manager, or supervisor in any criminal activity." Findings of fact relating to sentencing are reviewed under a clearly erroneous standard. United States v. Hamilton, 929 F.2d 1126, 1130 (6th Cir.1991). Government witness Ivory Brown testified that William Perry, Keith Murphy and Tyrus Blalock were working for Darren Armstrong and Terry Warren was working for Keith Murphy in Darren Armstrong's drug business. Nathaniel Taylor testified that he made trips to Memphis to pick up cocaine for the defendant. Since the evidence shows the defendant had an employee and used others to further his drug operations, we hold that the district court's findings are not clearly erroneous and should be affirmed. See Schultz, 14 F.3d 1093.
 
 
 182
 Section 3C1.1 states that "if the defendant willfully obstructed ... the administration of justice," the offense level should be increased by two levels. Murphy contends that he should not have been given a two-point enhancement because the only evidence presented was a minor incident indicative of nothing. However, the government produced evidence to the contrary. According to United States v. Eve, 984 F.2d 701, 703 (6th Cir.1993), "[t]he district court's determination that a defendant obstructed justice ... is a factual determination which this court reviews under the clearly erroneous standard." Investigator Porter of the Dyersburg Police Department testified that the defendant referred to an earlier discussion the officer had with coconspirator Darren Armstrong regarding "protection money." The defendant told the police officer that he should consider Darren Armstrong's offer seriously. The district court noted that the discussion Murphy had with the police officer "certainly falls within the obstruction of justice concept under the guidelines." That finding is not clearly erroneous and we affirm the district court on the issue of obstruction of justice.
 
 
 183
 We, therefore, REMAND solely for resentencing and for clarification for the basis for sentencing regarding the amount of drugs attributable to him in the conspiracy.
 
 ORDER
 
 184
 June 3, 1994.
 
 
 185
 Before: GUY and RYAN, Circuit Judges; and WELLFORD, Senior Circuit Judge.
 
 
 186
 Defendant Darren Armstrong has filed a petition for rehearing with suggestion for rehearing en banc. The panel has carefully considered his petition and adheres to its original disposition. However, with respect to the court's opinion issued on May 10, 1994, the panel would amend page 39, Section E, beginning with the second paragraph, as follows:
 
 
 187
 [Note: Amendment incorporated into text of opinion.]
 
 
 
 [1]
 See Franks v. Delaware, 438 U.S. 154 (1978)
 
 
 [2]
 Parker received a suspended 11-month, 29-day sentence plus an effectual fine. He was required to serve only 30 days of his sentence on weekends
 
 
 [3]
 Parker was reflected in the presentence report as having one juvenile shoplifting offense and an assault offense in March of 1989 for which he received a $100 fine and 48 hours' custody (to be suspended upon payment of fine). Shortly after the indictment, however, Parker was arrested for possession of crack cocaine
 
 
 [4]
 There was little testimony by Bunkley or McGee regarding dealings with Parker
 
 
 [5]
 Count 11 charged Armstrong with an attempt to wreck this aircraft, a violation of 18 U.S.C. Sec. 32
 
 
 [6]
 Counts 14 and 15 charged Armstrong with substantive drug offenses on the same date as the count 13 charge